PROSKAUER ROSE LLP
Marc A. Mandelman
Gershom R. Smith
1585 Broadway
New York, NY 10036-8299
Telephone 212.969.3000
*Attorneys for Defendants*

UNITES STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
MONA HAMZA,

               Plaintiff,

  v.

SAKS INCORPORATED and SAKS FIFTH
AVENUE, INC.,

               Defendants.
---------------------------------------X

07 CV 5974 (SCR) (LMS)

**ECF Case**

## Statement Pursuant to Local Rule 56.1 in Support of Defendant's Motion for Summary Judgment

Pursuant to Rule 56.1 of the Local Civil Rules, Defendants Saks Fifth Avenue, Inc. ("Saks" or the "Company") and Saks Incorporated submit the following statement of material facts as to which it contends there are no genuine issues to be tried.[1]

1.     Plaintiff started her career at Saks in 1997 as a cosmetics sales associate in Saks's White Plains location. (Hamza Tr. 17)

---

[1] References to the deposition transcripts of Mona Hamza, Susan Ishkanian, Billie Messina, Jennifer Cooling, Deyanira "Deya" Subin, Gosha Kostka, Mariann Gonzalez, and Sabah Boussouf are noted as "[Last Name] Tr. __." All referenced transcript citations are annexed to the accompanying Declaration of Gershom R. Smith, Esq. as Exhibits A through H. Documents marked by Plaintiff during depositions as "Plaintiff's Exhibits" are noted as "Pl. Exh. __" and are annexed to the accompanying Declaration of Gershom R. Smith, Esq. as Exhibit I. Documents marked by Saks during Plaintiff's deposition are noted as "Def. Exh. __" and are annexed to the accompanying Declaration of Gershom R. Smith, Esq. as Exhibit J. All other referenced documents are noted by Bates number and are attached to the accompanying Declaration of Gershom R. Smith, Esq. as Exhibit L.

2. In 2001, the White Plains location closed, and Plaintiff was hired by Saks's Greenwich, Connecticut store, where she continued in her role as a cosmetics sales associate. (Hamza Tr. 17)

3. There, she reported directly to the Greenwich store's Cosmetics Manager (Susan Green until February 2006, and Jennifer Cooling from July 2006 until Plaintiff's termination in March 2007), and indirectly to Billie Messina (the store's General Manager from May 2005 until Plaintiff's termination). (Messina Tr. 31, 38; Cooling Tr. 11)

4. While Plaintiff had performance problems since early in her career at Saks, the problems became more pronounced in 2005. (Gonzalez Tr. 30-31, 47; Def. Exh. 23)

5. In the Summer of 2005, a customer reported to Messina that she did not shop in Saks Greenwich's cosmetics department because Plaintiff was "very rude and very pushy." (Messina Tr. 117)

6. In a memo summarizing her thoughts on Plaintiff's 2005 performance, Ms. Green noted that Plaintiff's "service standards had yet to improve" and that Plaintiff "create[d] friction with the clients and her fellow associates." (Pl. Exh. 8, Ishkanian Tr. 64)

7. Because she was leaving Saks the next week and would thus not be employed by Saks at the time formal 2005 evaluations would be given, on or about January 28, 2006, Green drafted memos containing her evaluations for each of the approximately 30 employees she supervised. (Ishkanian Tr. 71-72; Messina Tr. 53-54, 56)

8. Green handed all of the reviews, including Plaintiff's, to Ishkanian, who reviewed the memo with Plaintiff during her formal evaluation in April 2006. (Messina Tr. 59-60; Ishkanian Tr. 69)

**Plaintiff's Injury**

9.  In June 2005, Plaintiff slipped on the steps at the Greenwich store and "sprained or pulled" her shoulder. (Hamza Tr. 109; Def. Exh. 11, 12)

10. The only impact of the shoulder injury was that Plaintiff could do stock work with only one hand, rather than with two. (Hamza Tr. 110)

11. Plaintiff was never asked to perform stock work at Saks. Rather, this work was done by a stock person. (Hamza Tr. 113)

12. On June 30, 2005, Plaintiff submitted a doctor's note indicating that due to her injury, she could only work three days per week. (Def. Exh. 13) There were no restrictions on the duties Plaintiff could perform during her days at work. (Def. Exh. 13; Hamza Tr. 121-122)

13. Plaintiff's request for a part-time schedule was granted without incident. (Hamza Tr. 121)

14. On November 2, 2005, Plaintiff's doctor reported to Saks's Workers' Compensation carrier that Plaintiff could work full-duty, again without any restrictions whatsoever. Thereafter, Plaintiff returned to full duty. (Def. Exh. 17; Hamza Tr. 134-135)

15. Today, the lingering effect of her injury is that her "shoulder hurts," requiring her to "take Advil almost every day." (Hamza Tr. 109, 114)

**Plaintiff's 2005 Request for a Month-Long Vacation was Granted.**

16. Every year since at least 2003, Plaintiff requested, and received, one month off to visit her mother in Egypt. (Hamza Tr. 61; Pl. Exh. 37, 38; D 000370)

17. In the spring of 2005, Plaintiff requested a month-long vacation beginning in July, and this request was granted. (Hamza Tr. 62-63)

18.     After Plaintiff's injury in June 2005, Plaintiff requested that her vacation be postponed until August so that she could attend physical therapy. (Hamza Tr. 62)

19.     Plaintiff was asked when she intended to come back to work (Saks never approves open-ended requests for time off). (Ishkanian Tr. 265; Messina Tr. 65-66, 69, 239) Plaintiff refused to give a return date. (Ishkanian Tr. 265)

20.     When Messina and Ishkanian insisted that they could not allow her to take an open-ended vacation, Plaintiff and Messina discussed the matter and Plaintiff said that she would return by September 9, 2005 (the start of a "double points" event). (Hamza Tr. 80-81, 85-86; Ishkanian Tr. 264-265, 268, 271; Messina Tr. 243-244)

21.     The "double points" program is a Saks customer loyalty program. During these events, customers get two "points" for every dollar they spend, and these points a redeemable for rewards. (Messina Tr. 241-242)

22.     The largest points events are in September and December. (Ishkanian Tr. 47)

23.     Despite the fact that Saks (both generally, and in Greenwich specifically) does not usually allow employees to take vacation in September, Ishkanian and Messina approved Plaintiff's September 9, 2005 return date, and Plaintiff took her month-long vacation as requested. (Hamza Tr. 80-81, 85-86; Ishkanian Tr. 262, 265)

24.     Plaintiff's request for vacation was never denied. (Hamza Tr. 68)

25.     Rather, Plaintiff's complaint was (and is) that in 2005 Messina and Ishkanian asked her to tell them when she intended to return from vacation. (Pl. Exh. 41; Hamza Tr. 69-71, 74-76; Ishkanian Tr. 264-265; Messina Tr. 234, 235)

26.     Plaintiff concedes that this was not motivated by discriminatory animus. (Hamza Tr. 83-84; Pl. Exh. 41)

27. In 2006, Plaintiff's request to take a month-long vacation to visit her mother in Egypt between June and July was approved without incident. (Hamza Tr. 87-88; Pl. Exh. 40)

**Plaintiff's Request for Accommodations for Ramadan Were Granted.**

28. Plaintiff did not discuss Ramadan with Messina in 2005. (Hamza Tr. 93)

29. Plaintiff claims that Susan Green, who left Saks in February 2006 (and played no part in her termination), told her that Messina would not approve her request. (Hamza Tr. 94)

30. Plaintiff admits that after Green's alleged refusal, she did not submit an accommodation request to human resources, did not complain to human resources or Saks's complaint hotline (which she had called before), and did not approach Messina, Ishkanian or anyone else about the matter. (Hamza Tr. 96-97)

31. In 2006, when she asked for time off for Ramadan ten days into the month-long holiday, Plaintiff's request was granted (as were the requests of two other Muslim Saks employees). (Hamza Tr. 239; Ishkanian Tr. 287-289; Messina Tr. 271-272, 276-277; Boussouf Tr. 32)

32. In 2007, Jennifer Cooling, who replaced Green, approached the only Muslim employee in the Cosmetics department unsolicited and asked if she wanted to leave early for Ramadan.[2] (Boussouf Tr. 34)

**Plaintiff Received a "Zero" for Customer Service in 2006.**

33. After Green left Saks in February 2006, the Cosmetics Manager position remained open until July 2006, when it was filled by Jennifer Cooling. (Messina Tr. 38; Cooling Tr. 11)

34. In the interim, Plaintiff reported directly to Messina. (Messina Tr. 115)

---

[2] In several documents as well as in her deposition, Ms. Cooling is referred to by her married name, Dispigna. Because she is referred to as Cooling in the Complaint, she will be referred to as Cooling here.

35. Plaintiff's performance evaluation for the second quarter of 2006 (encompassing May, June, and July), indicated that her behavior, which had been criticized by Green in January, had not improved. (Pl. Exh. 9; Cooling Tr. 36-37)

36. One of the elements of the quarterly review is called "GREAT Standards," which rate an employee's customer service. (Cooling Tr. 46)

37. In 2006, GREAT standards for each employee in the store were determined via a meeting attended by all six managers in the Greenwich location. (Cooling Tr. 107-08)

38. The consensus from the group was that Plaintiff should receive a zero for GREAT standards on her review. (Cooling Tr. 107-109)

39. One make-up artist, Ginger, came to Messina in tears because of Plaintiff's treatment of her, and Cooling had several conversations with vendors who were concerned about Plaintiff's aggressive and rude behavior. (Messina Tr. 129-130; Cooling Tr. 129-131)

**Saks Received More Than Fifteen Complaints About Plaintiff's Behavior in Five Months.**

40. On September 28, 2006, Laura Moreno, a make-up artist for the Laura Mercier cosmetics line, reported to Cooling that Plaintiff had upset both her and a customer named Mrs. Goldberg. (Pl. Exh. 13; Cooling Tr. 72) She explained that Mrs. Goldberg was upset that Plaintiff had not pulled the products she requested, so Moreno pulled all of the items for the customer and processed her return. (Pl. Exh. 13; Cooling Tr. 73)

41. Despite having nothing to with the sale (and in fact upsetting the customer) Plaintiff insisted that the sale be rung up for her, so that she would receive the commission. (Pl. Exh. 13; Cooling Tr. 73)

42. While, this was contrary to Saks's policy, Moreno did as Plaintiff instructed her, but reported Plaintiff's behavior to Cooling. (Pl. Exh. 13; Cooling Tr. 71-72)

43. The same day, Cooling received a separate complaint from a different co-worker about a similar dispute. Sabah Boussouf reported to Cooling that she had been working with a customer named Megan Gilfond when Plaintiff approached and insisted that the sale be rung up for her sales credit rather than Boussouf. (Pl. Exh. 14; Cooling Tr. 85-86) Boussouf reported that the customer apologized to Boussouf saying "I am sorry – she was not helping me – you were – I don't understand why she tried to take the products." (Pl. Exh. 14; Cooling Tr. 86)

44. Cooling drafted a memo memorializing the complaint, and counseled Plaintiff about it. (Pl. Exh. 14; Cooling Tr. 88)

45. Two days later, on September 30, 2006, Farnaz and Dana, a cosmetics salesperson and make-up artist respectively, separately reported a third incident to Cooling. (Cooling Tr. 99) As they explained, and as Cooling immediately memorialized in a memo, Dana was assisting one of Farnaz's client's, who wanted to buy a La Mer cream. (Pl. Exh. 15; Cooling Tr. 97-98) Dana brought her to the La Mer counter, which was staffed by Plaintiff. (Pl. Exh. 15; Cooling Tr. 97-98) The customer selected the product she wanted (despite Plaintiff's insistence that she purchase a larger size) and asked that the sale be rung up for Farnaz. (Pl. Exh. 15; Cooling Tr. 98)

46. After the customer left the store, Plaintiff followed Dana around the store saying (loud enough to disturb other salespeople and customers) "That is my sale" and "That should be rung up under my number, give it to me!" (Pl. Exh. 15; Cooling Tr. 98)

47. Dana was "very upset" and "shaken" by the incident. (Cooling Tr. 104) She reported that she was nervous about interacting with Plaintiff. (Cooling Tr. 104) Ishkanian and Cooling counseled Plaintiff about this incident. (Ishkanian Tr. 148; Cooling Tr. 100-101) Plaintiff concedes that these incidents occurred. (Hamza Tr. 184)

48.     In October of 2006, Mariann Gonzalez, the Cosmetics Manager in the Stamford store, called Ishkanian and informed her that she had received two customer complaints about Plaintiff. (Gonzalez Tr. 80-81)

49.     As Gonzalez described it, the first customer came into the Stamford, Connecticut store to return an item she had purchased in the Greenwich store. The customer informed the employee taking the return that she was returning the item in Stamford rather than in Greenwich because she felt Plaintiff was "too pushy and aggressive and [she] didn't want to deal with her." (Gonzalez Tr. 62) The sales associate brought this to Gonzalez's attention. (Gonzalez Tr. 59)

50.     Not long after, a second customer reported directly to Gonzalez that she would never go back to the Greenwich store because Plaintiff was too "aggressive," "pushy," and "abrasive" (Gonzalez Tr. 71) Gonzalez apologized to the customer and promised her that she would inform the Greenwich store of her complaint. (Gonzalez Tr. 72, 79)

51.     Gonzalez told Ishkanian that customers reported that they found Plaintiff "intimidating and overly aggressive" and they were not comfortable returning items to her. (Ishkanian Tr. 151-152; Messina Tr. 123-24)

52.     Ishkanian documented the call from Gonzalez in a memorandum and counseled Plaintiff regarding the reported complaints. (Pl. Exh. 16; Ishkanian Tr. 183)

53.     Vendors complained that when they would come to the Greenwich store to put on sales events, Plaintiff would not help them: "She wasn't cooperative, she wasn't booking appointments for events, she wasn't helping to set up the events." (Ishkanian Tr. 169)

54.     After receiving numerous complaints from customers, co-workers, and vendors within a short period of time, Cooling reported to Ishkanian that Plaintiff's behavior was affecting her business. (Ishkanian Tr. 163)

55. Ishkanian explained the performance improvement process to Cooling, and explained how to write up a Performance Improvement Written Reminder (Cooling had never written one before). (Ishkanian Tr. 163; Cooling Tr. 127)

56. On October 27, 2006, Ishkanian and Cooling delivered a Performance Improvement Written Reminder to Plaintiff. (Pl. Exh. 18)

57. The reminder, which Plaintiff refused to sign, noted that there had been a number of recent incidents where Plaintiff "caused friction with her coworkers," many of whom found Plaintiff "difficult to work with." (Pl. Exh. 18) The written reminder came with a stern warning: "Since we spoke 3 weeks ago, the store has received several complaints about your demeanor, some from associates, some from clients. At this point you need to understand that improvement in these areas is required immediately in order for you to remain employed at Saks Fifth Avenue." (Pl. Exh. 18)

58. On October 29, 2006, Geri Dellavalle, the Customer Service Manager, reported to Ishkanian that a customer had complained to her that Plaintiff "made her feel uncomfortable." (Pl. Exh. 19; Cooling Tr. 143-144)

59. Cooling and Ishkanian spoke to Plaintiff about this incident. (Ishkanian Tr. 184-185; Cooling Tr. 143-144)

60. Plaintiff conceded that she made the customer uncomfortable and could have handled the situation better. (Pl. Exh. 19; Ishkanian Tr. 184-185; Cooling Tr. 143-144)

61. On November 15, 2006, Plaintiff received a second Performance Improvement Written Reminder after she allowed a customer to leave the store with "pre-sale merchandise," which she knew she was not permitted to release to the customer until November 21, 2006. (D's Exh. 25)

62. Plaintiff admitted that her behavior was contrary to Saks's policy. (Hamza Tr. 185)

63. This second Written Reminder came with another warning: "This incident puts your integrity into question and will not be tolerated again by Saks." (D's Exh. 25)

64. La Prairie, one of the cosmetics lines Plaintiff was responsible for selling, regularly held "facial events" at Saks Greenwich. These events were very profitable for the store and the vendor. (Cooling Tr. 156)

65. On Monday, December 4, 2006, Luz Macaraeg, the account coordinator for La Prairie sent an e-mail to Maria Scopa, her manager, detailing numerous problems she had had with Plaintiff during an event at Saks two days before. (Pl. Exh. 23; Ishkanian Tr. 206-207; Messina Tr. 153)

66. Macaraeg reported that not only did Plaintiff not help at all during the event, she actually fought with her, the make-up artist (Virginia), and the sales associates who, due to Plaintiff's uncooperative behavior, were required to pitch in to assist with the event. (Pl. Exh. 23) Macaraeg noted that Plaintiff was "very disrespectful and her demeanor towards me and Virginia is unacceptable." (Pl. Exh. 23)

67. Ms. Scopa immediately forwarded Ms. Macaraeg's e-mail to Cooling, writing "I really need to resolve this or we will be unable to execute special events in your store." (Pl. Exh. 23; Cooling Tr. 153-155)

68. A decision by La Prairie not to hold events at Saks Greenwich would be devastating to the store, causing the loss of relationship and a "serious loss of business." (Ishkanian Tr. 206, 209)

69. Cooling immediately forwarded the e-mail to Messina and Ishkanian. (Pl. Exh. 23)

70. After receiving the e-mail, Ishkanian received a phone call from Scopa. Scopa explained that Plaintiff was causing problems with the line, that Macaraeg was very upset, and that she did not want Plaintiff on the La Prairie line any longer. (Ishkanian Tr. 217, 220, 222)

71. Because of the quantity and gravity of Plaintiff's recent offenses, Ishkanian asked Lisa Tarrant, the Regional Human Resources Director, whether Plaintiff should be terminated or placed on what Saks calls "Decision Making Leave." (Ishkanian Tr. 214)

72. Decision Making Leave occurs when there have been a number of documented incidents involving a Saks employee. (Messina Tr. 135-136) The employee is asked to take the rest of the day off to think about whether he or she wants to continue to work for Saks and if he or she will commit to improving his or her performance. (Messina Tr. 135-136, 167)

73. Tarrant told Ishkanian that Plaintiff should be given Decision Making Leave. (Ishkanian Tr. 214)

74. On December 9, 2006, Ishkanian and Cooling met with Plaintiff and gave her a memo they had co-authored entitled "Performance Improvement – Decision Making Leave." (Pl. Exh. 25; Ishkanian Tr. 212, 213-214)

75. They discussed the numerous complaints lodged against her and told her to think about her position with Saks and "determine if this is a role that you are able to perform at the required standards." (Pl. Exh. 25) If she was, she would be given a "final opportunity to improve." (Pl. Exh. 25)

76. On December 13, 2006, Plaintiff informed Cooling that she intended to remain at Saks. (D 000103)

-11-

77. Also on December 13, 2006, Rachel, another of Plaintiff's co-workers, reported to Cooling yet another incident of Plaintiff's rude and inappropriate behavior toward customers. (D 000124)

78. On January 20, 2007, Virginia, the make-up artist on the La Prairie line, complained to Messina that Plaintiff insisted that all La Prairie sales be rung up for her, whether or not she participated in the sale. (Pl. Exh. 29)

79. Messina explained to Plaintiff (as she and Ishkanian had numerous times before) that sales would not be rung up for her if she did not assist with those sales. (Pl. Exh. 29; Ishkanian Tr. 232; Messina Tr. 174, 188)

80. Plaintiff claimed that all cosmetics sales should be rung up for her whether she assisted or not. (Pl. Exh. 29; Messina Tr. 181-182, 184)

81. On January 27, 2007, Gosha and Margaret (make-up artists on the Yves St. Laurent line) separately reported to Cooling that a customer named Cindy Lodato insisted on buying a product from Gosha saying, regarding Plaintiff, "I cannot handle her – I want to buy this from you." (Pl. Exh. 30) Cooling documented this in a memorandum. (Cooling Tr. 188; Kostka Tr. 48)

82. Two days later, Deya Subin, a make-up artist on the Cle de Peau line reported to Cooling that a customer told her that she was "very aggravated" with Plaintiff because Plaintiff was on the phone while the customer was trying to make a purchase. (Pl. Exh. 30; Subin Tr. 48-50, 54; Cooling Tr. 192)

83. On February 3, 2007, Subin reported to Cooling that a customer named Carina Calderini complained that Plaintiff was "too pushy and that she sells anything to make money." (Pl. Exh. 30; Subin Tr. 55, 57; Cooling Tr. 193-194) Subin also told Cooling that Ms. Calderini

wanted to purchase additional products but declined because she did not want Plaintiff to get the commission. (Subin Tr. 57-58)

84.     On February 21, 2007, Plaintiff again released pre-sale merchandise in violation of Saks's policy. (Pl. Exh. 31) Ishkanian and Cooling warned Plaintiff once again about her violation of this policy. (Ishkanian Tr. 238; Cooling Tr. 196)

85.     On February 24, 2007, Eve, the FAC consultant, informed Messina that she would not bring customers to Saks's La Prairie counter because Plaintiff was "not helpful, abrasive, and [did] not make customers feel welcome." (Pl. Exh. 31; Messina Tr. 199)

86.     The next day, the La Prairie Account Executive reported that the vendor would not allow Plaintiff to attend a La Prairie training program because her behavior had rendered her "not in good standing" with the vendor. (Pl. Exh. 31)

87.     On March 1, 2007, Sylvana, a sales associate on the Sisley line, and Grace, a make-up artist employed by Sisley (*i.e.*, the vendor), reported to Cooling that after a customer named Juliette Nolta placed an order with Sylvana by phone, Plaintiff, insisting that Nolta was "her" customer, put the customer in an obviously uncomfortable situation by calling her at home to tell her that *she* was her personal shopper, and if she needed anything that *she* would work with her. (Pl. Exh. 33; Cooling Tr. 201-202, 206-207; Ishkanian Tr. 241-242)

### **Plaintiff was Terminated for Poor Performance.**

88.     In light of the seriousness and sheer number of complaints received about Plaintiff's conduct (from co-workers, customers, and vendors) despite numerous warnings and a Decision Making Leave, on or about March 1, 2007, Ishkanian, Messina, Cooling, and Lisa Tarrant jointly determined that Plaintiff's employment should be terminated. (Ishkanian Tr. 244-245, 248; Messina Tr. 207, 210, 219, 220-221, 224)

89.     Termination decisions cannot be made without corporate Human Resources' approval. (Messina Tr. 33, 43-44, 156)  In fact, corporate Human Resources makes the final determination on employment terminations. (Messina 45-46)

90.     On March 3, 2007, Plaintiff was called to Ishkanian's office and informed that she would be terminated. (Cooling Tr. 217)

91.     Plaintiff was told both orally and in writing the reasons for her termination: despite several formal developmental conversations, her performance had not improved; Saks had received numerous complaints regarding her service and demeanor; her behavior with her co-workers was unacceptable; and a vendor had serious complaints regarding her behavior. (Pl. Exh. 35)

92.     Plaintiff refused to acknowledge that her performance required any improvement whatsoever. (Cooling Tr. 218)

93.     Saks Greenwich continues to employ at least three Arab and Muslim employees, at least one of whom was hired by Billie Messina after Plaintiff's termination, and at least one of whom reports directly to Jennifer Cooling to this day. (Hamza Tr. 255; Boussouf Tr. 12; Ishkaniain Tr. 287-288)

**Plaintiff was Paid for All Hours She Worked,
and Received All Commissions She Earned.**

94.     Plaintiff explained that her complaint is not that she was not paid for time she worked, but rather that in 2005, Saks *should* have paid her for the two days per week that she did *not* work while she was part-time. (Hamza Tr. 140)  Plaintiff's theory is that had she not been injured she *would have* worked more hours, *would have* sold more, and therefore her average hourly wage *would have been* higher, thereby raising the amount she *would have* been paid while on vacation. (Hamza Tr. 140)

95.    Plaintiff does not know how vacation pay is calculated at Saks, and does not know how much additional vacation time she would have been paid under her theory. (Hamza Tr. 147, 148)

96.    Plaintiff was not paid commissions for the week ending February 24, 2007 because she was on vacation and thus did not earn any commissions during this period. (Hamza Tr. 221-223)

97.    Commissions are calculated and generated automatically by a corporate Human Resources computer. (Cooling Tr. 235)

**No Saks Employee Has Made a Negative Statement About Plaintiff to Any Prospective Employer.**

98.    No prospective employer has called requesting a reference, and Plaintiff admits that she is not aware of any act by any Saks employee to interfere with her ability to attain a position at Saks or any other employer. (Hamza Tr. 214; Messina Tr. 280-281; Cooling Tr. 221)

**Plaintiff Got a Higher Paying Job After Leaving Saks.**

99.    Plaintiff's job search after her termination from Saks consisted of walking down Greenwich Avenue (the street on which Saks is located in Greenwich) and submitting applications to stores she walked by. (Hamza Tr. 51)

100.    Plaintiff did not look in newspapers, contact job placement agencies or referral companies, or search the internet. (Hamza Tr. 52)

101.    Plaintiff received unemployment insurance benefits while not working. (Hamza Tr. 53)

102.    Since October 2007, Plaintiff has worked for Lord & Taylor as a make-up artist for Bobbi Brown cosmetics. (Hamza Tr. 47-48)

103. She currently makes $18.25 per hour plus 3% commission on all sales (Hamza Tr. 54-55).

104. While employed by Saks, Plaintiff was paid a base salary of $11.88 plus 9% on cosmetics sales. (Hamza Tr. 58-59)

105. Plaintiff is not currently looking for a job. (Hamza Tr. 56)

Dated: October 31, 2008
New York, New York

                Respectfully submitted,

                PROSKAUER ROSE LLP

                By:   /s/ Gershom R. Smith
                      Marc A. Mandelman
                      Gershom R. Smith
                      1585 Broadway
                      New York, NY 10036-8299
                      Phone: (212) 969-3000
                      *Attorneys for Defendants*